UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WENDY HA CHAU,<br><br>Plaintiff,<br><br>v.<br><br>X CORP., et al.,<br><br>Defendants. | Case No. 25-cv-10592-EMC<br><br>**ORDER GRANTING MOTIONS TO DISMISS; DENYING MOTION TO TRANSFER AS MOOT**<br><br>Docket Nos. 11, 19, 25 |

Plaintiff Wendy Ha Chau, proceeding pro se, sues the City & County of San Francisco ("the City"), City Supervisor Jackie Fielder, X Corp. (formerly Twitter), and Elon Musk under Section 1983. Plaintiff alleges that City Supervisor Jackie Fielder blocked all comments on an X post, including Plaintiff's comment, and that an unnamed X employee suspended Plaintiff's account, in violation of her First Amendment rights. The City moves to dismiss on all counts for failure to state a claim or in the alternative, qualified immunity. X moves to dismiss on all counts for lack of personal jurisdiction and failure to state a claim. X also moves to sever and transfer venue to Texas. *See* Dkt. No. 25.

Having considered the parties' briefs, the Court hereby **GRANTS** Defendants' Motions to Dismiss. Because the Court grants X's Motion to Dismiss, the Motion to Transfer is **DENIED** as moot.

United States District Court
Northern District of California

# I.    BACKGROUND

## A. Facts

Plaintiff is an attorney and "budding political activist of San Francisco."  Compl. ¶ 57 (Dkt. 1).  In 2024, she ran unsuccessfully to be the District 3 Supervisor of San Francisco.  *Id.* ¶¶ 25, 29.  After the race, she continued to be politically active on X, posting her opinions on "the problems plaguing San Francisco."  *Id.* ¶¶ 34–41.  Plaintiff "regularly collaborat[ed]" with other X users, gained "almost 500 followers" by posting political content, and even "obtained clients to directly help them navigate the social issues plaguing their businesses" due to San Francisco's Sanctuary City policy.  *Id.* ¶¶ 41, 42, 44.

On January 8, 2025, Supervisor Fielder was sworn in to represent District 9 on the San Francisco Board of Supervisors.  City's Mot. Dismiss, at 3 (Dkt. 11).  At 6:21pm on January 14, 2025, Supervisor Fielder posted on X from her @JackieFielder_ account:

> 'SAN FRANCISCO WILL REMAIN A SANCTUARY CITY
> This is my first piece of legislation I introduced today as Supervisor and I am thankful to ALL TEN of my colleagues on the San Francisco Board of Supervisors for cosponsoring my resolution affirming this.'  Compl. ¶¶ 44–45 (Dkt. 1).

Minutes later, Plaintiff commented on Supervisor Fielder's post with "videos of the crime and corruption stemming from Fielder's actions and inactions."  *Id.* ¶ 46.  Plaintiff alleges that her comments "helped" Supervisor Fielder's post "go 'viral'" to "2.9 million views."  *Id.* ¶ 47.  At some point, Supervisor Fielder turned off comments on the post.  *Id.* ¶ 48.  This meant that Plaintiff, along with the rest of the public, could not comment on the post.  *Id.* ¶¶ 49–50.

On January 15, Plaintiff wrote to X's customer support to report the "blatant 1st Amendment violations that X" allows elected politicians "to engage in by blocking citizens from commenting on their posts."  *Id.* ¶ 52.  At some point in late January or February, an unknown X employee responded to Plaintiff, claimed that her posts and account were "inauthentic," and suspended her account.  *Id.* ¶ 54.

Plaintiff brings three counts under 42 U.S.C. § 1983.  The first two counts allege joint First Amendment violations by Supervisor Fielder for blocking comments on her Sanctuary City post and the unnamed X employee for suspending Plaintiff's account.  *Id.* ¶¶ 94, 98, 111.  These

actions allegedly abridged Plaintiff's ability to engage in free speech (Count 1) and retaliated against her opposition to sanctuary city policies (Count 2). *Id.* ¶¶ 101, 102, 112, 117, 119. The third count alleges *Monell* liability against the City for its "de facto policy" of allowing elected officials "to use X as an **official government communication platform**" without "restricting elected officials from blocking or silencing members of the public based on viewpoint" or "properly train[ing] elected officials" on their "First Amendment obligations related to their use of social media for government speech." *Id.* ¶¶ 127, 128, 134, 136.

Defendants San Francisco and Jackie Fielder moves to dismiss for failure to state a claim. City's MTD, at 2 (Dkt. 11). Defendant X moves to dismiss for lack of personal jurisdiction and failure to state a claim. X Corp.'s Mot. Dismiss, at 1 (Dkt. 19). X also brings a motion to sever and transfer Plaintiff's claims against X to the Northern District of Texas per the forum selection clause in X's Terms of Service. X Corp.'s Mot. Transfer, at 1 (Dkt. 25).

## II.    LEGAL STANDARD

To overcome a Rule 12(b)(6) Motion to Dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (*Iqbal*) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007) (*Twombly*), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (*Manzarek*). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

3

unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## III.    DISCUSSION

### A. Request for Judicial Notice

X seeks judicial notice of Exhibits A and B.  Req. Judicial Notice (RJN), at 1 (Dkt. 20).

- Exhibit A (Trujillo-Jamison Decl., Dkt. 21): X Corp.'s Terms of Service, effective from November 15, 2024 to January 14, 2026, as they appeared publicly on X Corp.'s website on December 10, 2025.

- Exhibit B (Trujillo-Jamison Decl., Dkt. 21): X Corp.'s Statement of Information, filed on October 28, 2025 with the California Secretary of State.

Federal Rule of Evidence 201(b)(2) allows a court to notice a fact that is "not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (courts may consider judicially noticeable documents at the motion to dismiss stage).

The Court takes judicial notice of Exhibit A, the Terms of Service.  *See e.g.*, *Yuksel v. Twitter, Inc.*, No. 22-cv-05415-TSH, 2022 WL 16748612, at *3 (N.D. Cal. Nov. 7, 2022) ("[C]ourts in the Ninth Circuit routinely take judicial notice of terms of services.").  X's Terms of Service contain a Texas forum selection clause and a Texas choice of law provision.  Trujillo-Jamison Decl., Ex. A (Dkt. 21).

Exhibit B, a Statement of Information filed with the California Secretary of State, is subject to judicial notice as well.  *See e.g.*, *Cochran v. Air & Liquid Sys. Corp.*, No. 2:21-cv-09612-MEMF (PDx), 2022 WL 7609937, at *3 n.5 (C.D. Cal. Oct. 13, 2022) ("Courts routinely take judicial notice of records on file with a state's Secretary of State. . ..").  The Court takes judicial notice of the fact that X Corp. is a Nevada corporation doing business in California with its principal office address in Texas, facts not disputed by any party.  Trujillo-Jamison Decl., Ex. B. (Dkt. 21).

**B. Personal Jurisdiction over X for Counts 1 and 2**

"When no applicable federal statute authorizes personal jurisdiction, a district court applies the law of the state where the court sits." *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 950 (N.D. Cal. 2017) (citing *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998)); Fed. R. Civ. P. 4(k)(1)(A). "California's long-arm statute is co-extensive with federal standards," so a federal district court in California "may exercise personal jurisdiction" over a nonresident defendant "if doing so comports with federal constitutional due process." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Per the Due Process Clause, the "defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). A court in the forum state may exercise either general or specific personal jurisdiction over a nonresident defendant. *Boschetto*, 539 F.3d at 1016. Plaintiff contends that the Court has specific personal jurisdiction over X.[1]

"Specific personal jurisdiction exists when (1) the non-resident defendant purposefully directs activities to the forum or purposefully avails itself of the privilege of conducting activities in the forum; (2) the claim arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction is reasonable." *Smith*, 262 F. Supp. 3d at 950 (citing *Schwarzenegger*, 374 F.3d at 802). The plaintiff bears the burden of showing that "jurisdiction is appropriate," but "the plaintiff need only make a prima facie showing of jurisdictional facts." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990); *see Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977) ("[I]f a plaintiff's proof is limited to written materials, it is necessary only for these materials to demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss."). "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of

---

[1] Plaintiff does not argue that this Court has general personal jurisdiction over X. Opp'n X Corp.'s MTD, at 4–5 (Dkt. 26); X Corp.'s Reply ISO MTD, at 1–2 (Dkt. 29). She thus waives this argument. *Tatum v. Schwartz*, No. Civ. S-06-01440 DFL EFB, 2007 WL 419463, at *3 (E.D. Cal. Feb. 5, 2007) (party that failed to address argument in opposition "tacitly concede[d]" her claim).

United States District Court
Northern District of California

jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

The Section 1983 claims at issue here are "a species of tort liability" governed by the *Calder* effects test. *Mendez v. County of Los Angeles*, 897 F.3d 1067, 1074 (9th Cir. 2018); *see Calder v. Jones*, 465 U.S. 783, 788–90 (1984). This test determines whether a defendant "'purposefully direct[ed] his activities' at the forum state . . . whether or not the actions themselves occurred within the forum." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (quoting *Schwarzenegger*, 374 F.3d at 802–03). Per *Calder*, the first prong of specific personal jurisdiction is satisfied if the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Foods Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).

### 1.  Intentional Act

In the context of the *Calder* test, an intentional act refers simply to an act that the defendant intended to perform, without reference to its consequences – such as pulling a trigger. *Schwarzenegger*, 374 F.3d at 806. Here, Plaintiff alleges that X suspended her account. Compl. ¶ 54 (Dkt. 1). This suffices to allege an "intentional act." *See Schwarzenegger*, 374 F.3d at 806 (placing an ad in a journal was an intentional act); *see also Calder*, 465 U.S. at 788–89 (publishing an article was an intentional act). Plaintiff satisfies the first prong of the *Calder* effects test.

### 2.  Express Aiming

Next, Plaintiff must show that X expressly aimed its intentional act at California. In *Calder*, the Court held that an allegedly libelous story was expressly aimed at California because it "concerned the California activities of a California resident" and "impugned the professionalism of an entertainer whose television career was centered in California." *Calder*, 465 U.S. at 788–90. In other words, because "California [wa]s the focal point both of the story and of the harm suffered," the defendants "expressly aimed" their conduct at California. *Id*. at 789.

To evaluate whether "tortious conduct on a nationally accessible website is expressly aimed" at a particular state in which the website can be viewed, the Ninth Circuit has considered factors including "the interactivity of the defendant's website," "the geographic scope of the defendant's commercial ambitions," and "whether the defendant 'individually targeted' a plaintiff known to be a forum resident." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229 (9th Cir. 2011) (citations omitted).

As to commercial reach, the Ninth Circuit has held that "'corporations whose websites exploit a national market' cannot 'defeat jurisdiction in states where those websites generate substantial profits from local consumers.'" *Briskin v. Shopify, Inc.*, 135 F.4th 739, 757 (9th Cir. 2025) (quoting *Mavrix Photo*, 647 F.3d at 1231). In *Mavrix Photo*, the defendant website was a "large publication[] that sought and attracted [a] nationwide audience[]" and "cultivated [its] nationwide audience[] for commercial gain." *Mavrix Photo*, 647 F.3d at 1230; *see Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984) (holding that because a magazine "produce[d] a national publication aimed at a nationwide audience," it must "reasonably anticipate being haled into court" in a state where it "continuously and deliberately exploited" that state's market). Use of such service in a particular state was a "predictable consequence" of this business model, such that the website could not "characterize the consumption of its product[] in any state as 'random,' 'fortuitous,' or 'attenuated.'" *Mavrix Photo*, 647 F.3d at 1230 (quoting *Burger King Corp.*, 471 U.S. at 480). Where the defendant engages in this kind of nationwide targeting, no "differential treatment of the forum state" is required for a finding of express aiming. *Briskin*, 135 F.4th at 758. That the website "appeal[ed] to, and profit[ed] from, an audience in a particular state" is sufficient. *Mavrix Photo*, 647 F.3d at 1231.

The interactivity of a website may further support a finding of express aiming. *Herbal Brands Inc., v. Photoplaza, Inc.*, 72 F.4th 1085, 1091–1092 (9th Cir. 2023). A website is considered interactive, instead of passive, if "users can exchange information with the host computer." *Cybersell, Inc. v. Cybersell. Inc.*, 130 F.3d 414, 418 (9th Cir. 1997). A "higher degree of interactivity provides greater support for the exercise of specific jurisdiction," as the interactivity may demonstrate the defendant's "conduct directly targeting the forum." *Herbal*

United States District Court
Northern District of California

7

*Brands*, 72 F.4th at 1092 n.3; *Mavrix Photo*, 647 F.3d at 1226–27, 1229.  The operative nature of a national website and its targeting of consumers for interaction, particularly where there is an opportunity to tailor the interaction to the consumers in the forum state, sets the jurisdictional analysis thereof apart from traditional model of generically injecting a product into the stream of commerce.  *C.f. Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 112 (1987) (finding that the "placement of a product into the stream of commerce" or the "defendant's awareness that the stream of commerce may or will sweep the product into the forum State" is insufficient alone to show conduct "the defendant purposefully directed toward the forum State;" "[a]dditional conduct of the defendant" that "indicate[s] an intent or purpose to serve the market in the forum State" is required).

In *Chien v. Bumble, Inc.*, the court found that California had specific personal jurisdiction over Bumble, a dating and relationship app incorporated in Delaware and headquartered in Texas, due to the "highly interactive" nature of the app.  641 F. Supp. 3d 913, 923–24, 928–930 (S.D. Cal. 2022).  Not only did Bumble generate "revenue from thousands of paying users [residing] in California," the app "collected personal and location information" to "tailor" its presentation so that "each user within each forum [was] viewing content specific to that forum."  *Id.* at 928–29 (citations omitted).  While the app operated globally, the court found that the app "offers value to its users on the basis that its content within the forum State displays other users also presently within the forum State."  *Id.*  Consequently, the court found that Bumble "continuously and deliberately exploited" the California market such that Bumble had "purposefully directed activities toward California."  *Id.* at 929–30; *see Mavrix Photo, Inc.*, 647 F.3d at 1230 (quoting *Keeton*, 465 U.S. at 781).  *Chien* appears consistent with current Ninth Circuit law of jurisdiction over such interactive websites.

Here, the website at issue is X, an interactive website with a nationwide reach.  Plaintiff alleges that she paid "$2,000 on a type of X membership for political figures or media personalities" to mount her campaign for a local San Francisco election.  Compl. ¶¶ 27, 34 (Dkt. 1).  Though Plaintiff only campaigned for a short amount of time, she earned over 5% of the popular vote.  *Id.* ¶¶ 26–29.  Plaintiff alleges that "90% - 99% of her votes" came as a "direct

result of being on X." *Id.* ¶ 30. Personal jurisdiction over X may be found here for several reasons.

First, X's high degree of interactivity "weighs in favor of purposeful direction." *See Chien*, 641 F. Supp. at 928; *Herbal Brands Inc.*, 72 F.4th at 1092 n.3. X is an interactive website, as users "exchange information with the host computer" to post, share, and comment on content and follow other users. *See Cybersell, Inc.*, 130 F.3d at 418; Compl. ¶¶ 35, 36, 38, 42, 44, 45–47. Further, an X employee directly interacted with Plaintiff through the website's customer support chat to notify her of her account suspension. Compl. ¶¶ 52, 54. X's Terms of Service state that X collects information a user provides to the website when using its services, and that by posting content, users grant X the license to "curat[e]" that content "in any and all media or distribution methods." Trujillo-Jamison Decl., Ex. A at 2 (Dkt. 21). Given Plaintiff's allegation that most, if not all, of her votes in the District 3 Supervisor election came from her use of X, just like Bumble, X collects "location information" to "tailor" its presentation so that users within California view content and other users "specific to that forum." *See* Compl. ¶¶ 29, 30 (Dkt. 1); *Chien*, 641 F. Supp. 3d at 928–29. This tailoring provides the "[a]dditional conduct" that "indicate[s]" X's "intent or purpose to serve" the California market. *See Asahi Metal Indus. Co., Ltd.*, 480 U.S. at 112. Indeed, by purchasing a membership for political figures or media personalities to solicit votes in a local election, Plaintiff sought the "value" of X displaying her content to "other users also presently within the forum State." *See* Compl. ¶¶ 27, 34; *Chien*, 641 F. Supp. 3d at 929.

Furthermore, X "continuously and deliberately" exploits the California market, as its contacts with California are not "random, isolated, or fortuitous." *See Keeton*, 465 U.S. at 774, 781. X maintains commercial ties to California through its "registration with the California Secretary of State." *See Loomis v. Slendertone Distrib., Inc.*, 420 F. Supp. 3d 1046, 1070 (S.D. Cal. 2019); Trujillo-Jamison Decl., Ex. B (Dkt. 21). Plaintiff's allegation that she spent $2,000 on her X membership demonstrates that X generates revenue from "paying users [residing] in California." *See* Compl. ¶ 34 (Dkt. 1); *Chien*, 641 F. Supp. 3d at 928 (citations omitted); *see also Mavrix Photo, Inc.*, 647 F.3d at 1230–31. Plaintiff's allegation that through this membership and her X posting, she was able to quickly garner political support in a local California election further

demonstrates X's targeting of a California market.  Compl. ¶¶ 27–30.  Along with its high interactivity, X has "exhibited an intent to cultivate an audience" in California.  *See Herbal Brands*, 72 F.4th at 1092.  Consequently, X's online conduct was expressly aimed at California, satisfying the second prong of the *Calder* effects test.

### 3. Foreseeable Harm

Finally, Plaintiff contends she "suffered foreseeable harm in California, including loss of political speech, professional reputation, and access to California voters" because of her X account suspension.  Opp'n X Corp.'s MTD, at 5 (Dkt. 26).  In *Calder*, it was foreseeable that the plaintiff, a California actress, would experience the harm of the defendants' libelous story about her "in the State in which she lives and works."  465 U.S. at 789–90.  Similarly, it was foreseeable to X that the suspension of Plaintiff's account – which was of a kind specifically designed for politicians and media personalities – was likely to cause her harm in California, where she lives, works, conducts activism, and ran for an elected office.  Compl. ¶¶ 12, 25, 27, 34, 35, 57 (Dkt. 1).  This is particularly so given that Plaintiff was suspended after an X employee reviewed her posts and determined them to be "inauthentic."  *Id.* ¶¶ 54, 87.  Such review of Plaintiff's X account would have made clear to X that San Francisco in particular was "the focal point" of Plaintiff's activity and where she would suffer harm from the suspension.  *See id.* ¶ 55; *Calder*, 465 U.S. at 788–90.  Plaintiff thus satisfies all three prongs of the *Calder* effects test to demonstrate that X "purposefully directed" its conduct at California.  *See Schwarzenegger*, 374 F.3d at 805.

\*\*\*

 The Court now turns to the remaining two prongs of the specific personal jurisdiction analysis.

Plaintiff's claims also "arise out of or relate to" X's forum-related activities.  *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (citations omitted).  Plaintiff's claims "arise out of" X's decision to suspend her account, which X allegedly knew was centered in California.  *See Briskin*, 135 F.4th at 760; Compl. ¶¶ 27, 28, 34, 35, 52, 54, 87.  Similarly, Plaintiff's claims "relate to" X's decision to suspend Plaintiff's California-based account and

United States District Court
Northern District of California

activities in connection therewith.  *See Briskin*, 135 F.4th at 760 (citations omitted); Compl. ¶¶ 55, 87, 117; *see also O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023) ("It is clear that O'Handley suffered a concrete injury when Twitter limited other users' ability to access his posts and then later suspended his account.").  Thus, Plaintiff has met her burden of making a "prima facie showing of jurisdictional facts" for specific personal jurisdiction.  *See Sher*, 911 F.3d at 1361; *Data Disc, Inc.*, 557 F.2d at 1285.

X makes no argument that the exercise of specific personal jurisdiction would be unreasonable.  *See Schwarzenegger*, 374 F.3d at 802.  Consequently, the Court has specific personal jurisdiction over X per the *Calder* effects test.

X's Motion to Dismiss for lack of personal jurisdiction is **DENIED**.

## C. State Action Under 42 U.S.C. § 1983 for Counts 1 and 2

"Section 1983 provides a cause of action against '[e]very person who, *under color of any statute, ordinance, regulation, custom, or usage, of any State*' deprives someone of a federal constitutional or statutory right.  *Lindke v. Freed*, 601 U.S. 187, 194 (2024) (quoting 42 U.S.C. § 1983 (emphasis added)).  Section 1983 protects only "against acts attributable to a State, not those of a private person." *Id.*  While state or local officials who routinely interact with the public "may look like they are always on the clock," the state action doctrine excludes from liability "acts of officers in the ambit of their personal pursuits." *Id.* at 196 (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)).  The state action doctrine "protects a robust sphere of individual liberty" for public officials or employees. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019).  In short, not everything a public employee or official does is state action.

Indeed, the First Amendment itself "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  This right includes the ability to speak about "information related to or learned through public employment" if the speech is not "itself ordinarily within the scope of [the] employee's duties." *Lane v. Franks*, 573 U.S. 228, 236, 240 (2014).  The right also includes "editorial control over speech and speakers on [the public employee's] properties or platforms."

United States District Court
Northern District of California

11

*Halleck*, 587 U.S. at 816.

In *Lindke v. Freed,* the Supreme Court set out the test to determine whether a city manager's deletion of comments and blocking of a social media user on a public post related to his official duties constituted state action. A public official's social-media activity constitutes state action under Section 1983 only if the official "(1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." 601 U.S. at 198. While the "appearance and function of the social-media activity are relevant at the second step," they "cannot make up for a lack of state authority at the first." *Id.*

### 1. Actual Authority

The first prong of the *Lindke* test requires that "the conduct allegedly causing the deprivation of a federal right be *fairly attributable to the State*." *Id.* at 188 (quoting *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937 (1982)) (emphasis in original). For state action to exist, the State must be "*responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis in original). "Private action–no matter how 'official' it looks–lacks the necessary lineage" to the State's power. *Lindke*, 601 U.S. at 198.

Just because a public official's social-media page "looks and functions like an outlet for city updates and citizen concerns," a public official's conduct on that page "is not attributable to the State unless he was 'possessed of state authority' to post city updates and register citizen concerns." *Id.* at 199 (quoting *Griffin v. Maryland*, 378 U.S. 130, 135 (1964)). If the State did not entrust the public official with those specific responsibilities, the State cannot "fairly be blamed" for the way the public official discharges them. *Lugar*, 457 U.S. at 936.

Furthermore, courts must not rely on "excessively broad job descriptions" to conclude that a public official is authorized to speak for the State. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 529 (2022) (citations omitted). "The inquiry is not whether making official announcements *could* fit within the job description; it is whether making official announcements is *actually* part of the job that the State entrusted the official to do." *Lindke*, 601 U.S. at 201 (emphasis original).

Actual authority to speak on the State's behalf may come from a "statute, ordinance,

regulation, custom, or usage." *Id.* at 200 (quoting 42 U.S.C. § 1983). "Statutes, ordinances, and regulations refer to written law," while "'[c]ustom' and 'usage' encompass 'persistent practices of state officials' that are 'so permanent and well settled' that they carry 'the force of law.'" *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). In other words, a current public official would have authority "even in the absence of written law" if "prior [public officials] have purported to speak on [the State's] behalf and have been recognized to have that authority for so long that the [official's] power to do so has become 'permanent and well settled.'" *Id.* (quoting *Adickes*, 398 U.S. at 168). "And if an official has authority to speak for the State, he may have the authority to do so on social media even if the law does not make that explicit." *Id.*

In short, a public official "must have actual authority rooted in written law or longstanding custom to speak for the State," and that authority "must extend to speech of the sort that caused the alleged rights deprivation." *Id.* at 201. "If the plaintiff cannot make this threshold showing of authority, he cannot establish state action." *Id.*

### a. Written Law

Actual authority may come from written law. In *Garnier*, the Ninth Circuit found that the defendant, president of the Board of Trustees for the Poway Unified School District, had actual authority to make official announcements on social media regarding the PUSD Board of Education's activities because the PUSD bylaws demonstrated that speaking to the public was "part of the job that the State entrusted" the defendant to do. *Garnier v. O'Connor-Ratcliff*, 136 F.4th 1181, 1188–90 (9th Cir. 2025). Not only did the bylaws "describe the role of individual board members in communicating" information to the public, the bylaws specifically "designate[d] the Board president as one of the Board's representatives who can communicate public statements from the Board 'regarding district issues' to community members." *Id.* at 1188–89 (citations omitted). Thus, in determining whether the defendant's blocking of specific users on her social media pages was state action, the Ninth Circuit found that the PUSD bylaws satisfied *Lindke's* first step. *Id.* at 1190.

The issue is whether Supervisor Fielder's actions at issue were authorized as acts on behalf

United States District Court
Northern District of California

of the City.  Here, Plaintiff points to the City Charter, the Sunshine Act, and the Brown Act as sources of Supervisor Fielder's actual authority to speak on behalf of the City, but none of these sources grant Supervisor Fielder the authority that Plaintiff alleges.

i.    City Charter

Article II of San Francisco's Charter states that the "Board of Supervisors shall act only by written ordinance or resolution" with a "majority, two-thirds, three-fourths, or other vote of all members of the Board," and that "[a]ll legislative acts shall be by ordinance." S.F., CAL., Charter art. II, §§ 2.104, 2.105 (2006, 2024).  As such, an individual supervisor cannot act or legislate unilaterally; she can only act as a member of a board majority through ordinances.  While the Charter requires the Board to "adopt and maintain a Sunshine Ordinance to liberally provide for the public's access to their government meetings, documents, and records," the Board must appoint a Clerk who is specifically "responsible for the publication, as required by law, of ordinances, resolutions and other matters acted on by the Board for which publication is specified." *Id.* §§ 2.108, 2.117.  The Clerk, not the Board of Supervisors, is tasked with "keep[ing] a public record of the proceedings of the board." *Id.* § 2.117.  Unlike the PUSD bylaws, the Charter does not provide for a "role of individual board members in communicating" information to the public. *See Garnier*, 136 F.4th at 1188.

ii.    Brown Act and Sunshine Ordinance

The Brown Act requires "[a]ll meetings of the legislative body of a local agency" to "be open and public," and that meeting agendas "provide an opportunity for members of the public to directly address the legislative body" on items of consideration.  Cal. Gov't Code §§ 54953(a), 54954.3(a)(1).  Like the City's Charter, the Brown Act governs the conduct of a legislative body, not an individual legislator.  Plaintiff claims that the San Francisco Sunshine Ordinance of 1999 and the Brown Act "compel[]" Supervisor Fielder "to post her actions on a platform like X." Opp'n City's MTD, at 3 (Dkt. 18).  That is not the case.  While the Brown Act does not "prevent[] an employee or official of a local agency" from "engaging in separate conversations or communications on an internet-based social media platform to answer questions, provide information to the public, or to solicit information from the public regarding a matter that is within

14

the subject matter jurisdiction of the legislative body," the Act does not authorize a single legislator to act on behalf of the City.  Cal. Gov't Code § 54952.2(3)(A).  In fact, the central point of the Act is to prevent decision-making by a group of legislators outside the bounds of a sanctioned public hearing.  *Id.* § 54950.  Nor does the Act compel any supervisor to use social media to announce official acts.

The Sunshine Ordinance strengthens the Brown Act's open meeting requirements by requiring "documents on file with the clerk of the policy body" to be "made available to the public" through public records requests.  S.F., CAL., Admin. Code §§ 67.5, 67.9, 67.21.  The Ordinance also requires each city department to "maintain on a World Wide Web site . . . information that it is required to make publicly available," such as meeting notices, agendas, and minutes.  *Id.* § 67.29-2.  As such, the Sunshine Ordinance requires legislative materials to be accessible online, but through a designated "custodian of a public record" or clerk, not through social media posts made by individual officials.  *Id.* §§ 67.21, 67.23.  Indeed, the Ordinance makes clear that "[e]very member of a policy body retains the full constitutional rights of a citizen to comment publicly on the wisdom or propriety of government actions, including those of the policy body of which he or she is a member."  *Id.* §§ 67.17.  It does not authorize individual legislators to act on behalf of the polity.

Consequently, Plaintiff's single conclusory allegation that Supervisor Fielder, as an "elected member" of the Board of Supervisors, had "actual authority to speak on the state's behalf on SF remaining a Sanctuary City," does not satisfy *Lindke's* first prong.  Compl. ¶ 63 (Dkt. 1).  Plaintiff does not point to any "statute, ordinance," or "regulation" that confers actual authority to Supervisor Fielder to speak on the City's behalf through her X posts.  *See Lindke*, 601 U.S. at 200.  Rather than demonstrating that speaking to the public was "part of the job that the [City] entrusted" to Supervisor Fielder, the Charter and the Sunshine Ordinance make clear that an appointed clerk is responsible for publicizing the Board's actions and receiving public feedback.  *See id.* at 201; S.F., CAL., Charter art. II, § 2.117; S.F., CAL., Admin. Code §§ 67.21, 67.23.  In fact, the Brown Act and the Sunshine Ordinance protect an individual supervisor's right "to speak as a citizen" (and not on behalf of the City) on social media, including the ability to speak on

United States District Court
Northern District of California

"information related to or learned through public employment." *See Garcetti*, 547 U.S. at 417; *Lane*, 573 U.S. at 236; S.F., CAL., Admin. Code § 67.17; Cal. Gov't Code § 54952.2(3)(A).

### b. Longstanding Custom

In the absence of written law, a current public official can have actual authority to speak for the State on social media if a "prior [public official]" had "purported to speak on [the State's] behalf" and was "recognized to have that authority for so long that the [official's] power to do so" has become a "permanent and well settled" custom. *Lindke*, 601 U.S. at 200; *Adickes*, 398 U.S. at 168. In interpreting the meaning of "custom" in Section 1983, the Court in *Adickes* noted that Congress was concerned with the "persistent and widespread discriminatory practices of state officials in some areas of the post-bellum South," where the systematic maladministration of facially equal and just laws denied equal protection. 398 U.S. at 167–68. Those "settled practices of state officials," enforced by "imposing sanctions or withholding benefits," "transform[ed] private predilections into compulsory rules of behavior no less than legislative pronouncements," thus allowing a plaintiff to point to such customs as the source of their injury. *Id.* at 168.

Plaintiff contends that because the City "failed to create their own social media platform that allows elected officials to reach their constituents," the City "allows their elected officials to use X in their official capacity to speak on behalf of the state." Compl. ¶¶ 92, 93 (Dkt. 1). In her Opposition, Plaintiff asserts that "the City has a widespread and longstanding practice of permitting supervisors to use private social media platforms as official channels to announce legislation and municipal policy, while providing no comparable public forum for constituent engagement." Opp'n City's MTD, at 4 (Dkt. 18).

These allegations do not show a longstanding custom whereby individual supervisors have actual authority to speak for the City through their social media posts. The City's alleged failure to create its own social media platform does not automatically transform an individual supervisor's page into an official channel, and Plaintiff does not point to any prior supervisor

16

claiming authority to speak for the City through social media.[2]  *See Lindke*, 601 U.S. at 200. Indeed, Plaintiff's own allegations admit that the City "allows" or "permit[s]" supervisors to use private social media platforms, not that it is a "compulsory rule[] of behavior" for supervisors to make official announcements on social media.  *See* Compl. ¶¶ 93 (Dkt. 1); Opp'n City's MTD, at 4 (Dkt. 18); *Adickes*, 398 U.S. at 168.  To the contrary, the City directs constituents to its website, not a social media account, to submit comments on current legislative matters.  *See* https://sfbos.org/submit-comments-current-legislative-matters/.  Further, as discussed above, the Sunshine Ordinance requires each city department to "maintain on a World Wide Web site" for meeting notices, agendas, and minutes; delegating official announcements to individual supervisors' social media would go against the requirements of the Act.  *See* S.F., CAL., Admin. Code § 67.29-2.  There is nothing to suggest a broad delegation by the City to each individual supervisor to speak officially on its behalf.

Hence, Plaintiff does not sufficiently allege that Supervisor Fielder had actual authority to speak on behalf of the City through her posts on X.  Neither written law nor custom entrusted Supervisor Fielder with the specific responsibility of communicating with the public.  *See Lindke*, 601 U.S. at 201.  Because she does not make the "threshold showing of authority," Plaintiff "cannot establish state action" to sustain Counts 1 and 2.  *See id.*

### 2.  Exercise of Authority

Even if Plaintiff could show actual authority, she does not meet *Lindke's* second requirement of showing that Supervisor Fielder purported to exercise state authority in making her Sanctuary City post.  To determine whether a public official "purported to exercise" state authority when posting on social media, courts must consider the "post's content and function" under the circumstances in which the post was made.  *Id.* at 198, 203.  An official "purports to speak on behalf of the State while speaking 'in his official capacity or' when he uses his speech to fulfill

[2] The Board of Supervisors, does, in fact, have its own X account that posts links to meeting agendas, meeting minutes, and legislation introduced. *See* https://x.com/sfbos.

United States District Court
Northern District of California

'his responsibilities pursuant to state law.'"[3] *Id.* at 201 (quoting *West v. Atkins*, 487 U.S. 42, 50 (1988)).

Importantly, an official "does not necessarily purport to exercise his authority simply by posting about a matter within it." *Lindke*, 601 U.S. at 203. An official may "post job-related information for any number of personal reasons, from a desire to raise public awareness to promoting his prospects for reelection." *Id.* If the public official "merely repeats or shares otherwise available information . . . it is far less likely that he is purporting to exercise the power of his office" and it is "much more likely that he is engaging in private speech 'relate[d] to his public employment' or 'concern[ing] information learned during that employment.'" *Id.* (quoting *Lane*, 573 U.S. at 238).

The "context" of a public official's speech matters.[4] *Id.* at 201–02. If a social media account "carrie[s] a label" (*e.g.*, "this is the personal page of Jackie Fielder") or a disclaimer (*e.g.*, "the views expressed are strictly my own"), the public official "would be entitled to a heavy (though not irrebuttable) presumption that all of the posts on his page were personal." *Id.* at 202. However, context can also "make clear that a social-media account purports to speak for the government—for instance, when an account belongs to a political subdivision (*e.g.*, a 'City of Port Huron' Facebook page) or is passed down to whomever occupies a particular office (*e.g.*, an '@PHuronCityMgr' Instagram account)." *Id.* Without clear "personal" or "official" labels, a public official's account may be "'mixed use'—a place where he made some posts in his personal capacity and others in his capacity as city manager." *Id.*

In assessing the claims such as that made herein, the court must focus on the relevant post

---

[3] For example, consider a mayor "who makes the following announcement exclusively on his Facebook page: 'Pursuant to Municipal Ordinance 22.1, I am temporarily suspending enforcement of alternate-side parking rules.'" *Lindke*, 601 U.S. at 203. The mayor is "purporting to discharge an official duty" through the post, as he made an "express invocation of state authority," the post has an "immediate legal effect," and "the order is not available elsewhere." *Id.*

[4] For example, a school board president makes an announcement that the "board has lifted pandemic-era restrictions on public schools." *Lindke*, 601 U.S. at 201. If made "at a school board meeting," the president spoke "in his official capacity as a school board president," which constitutes state action. *Id.* If made "at a backyard barbecue with friends whose children attend public schools," the president spoke "in his personal capacity as a friend and neighbor," which is private action. *Id.* at 201–02. Though the "substance of the announcement is the same," the "context" differs. *Id.* at 202.

to determine whether they constitute state action. Here, the relevant posts are the ones from which a member of the public has been denied access. "[I]f an official blocks an individual from a page altogether, then the existence of any post made in an official capacity on which the individual wished to comment would render the blocking state action." *Garnier*, 136 F.4th at 1191. However, if "an official deletes comments from a post," the "only relevant post[]" for state action purposes would be the one from which the plaintiff's comments were removed. *Garnier*, 136 F.4th at 1191; *Lindke*, 601 U.S. at 204. The case at bar falls into the latter category. At issue is Supervisor Fielder's deletion, in effect, of comments on her Sanctuary City post.

The Eight Circuit's analysis in *Campbell v. Reisch* is instructive. 986 F.3d 822, 823–25 (8th Cir. 2021). There, the panel found that a Missouri state representative who blocked a Twitter user from accessing her Twitter account did not violate the user's First Amendment rights under Section 1983. *Id.* at 826. There was no state action. The court reasoned that the personal account the representative made to solicit votes did not automatically transform into a governmental account solely by virtue of her election to public office. *Id.* While the representative "occasionally used the account to provide updates on where certain bills were in the legislative process," the court found that those tweets were "fully consistent" with her prior account use "to tout her record because they show voters that she was actively advancing her legislative agenda and fulfilling campaign promises." *Id.* Thus, because she was not purporting to conduct "official governmental activity" through her Twitter posts, the representative could "control who gets to speak or what gets posted" on her page. *Id.* at 826–28. Her blocking of a member of the public did not constitute state action.

Plaintiff does not plausibly allege that Supervisor Fielder exercised state authority in her Sanctuary City post. The information in the post – including that the Sanctuary City resolution was the "first piece of legislation [Supervisor Fielder] introduced," and that Supervisor Fielder was "thankful" to her colleagues for "cosponsoring" her resolution – was not official information shared "exclusively" through Supervisor Fielder's post. Compl. ¶ 45 (Dkt. 1); *see Lindke*, 601 U.S. at 203. The Board of Supervisors held an open meeting on January 14th, 2025 where Supervisor Fielder introduced the resolution, and the meeting minutes were made available on the

19

Board of Supervisors website. *See* https://sfbos.org/sites/default/files/bag011425_minutes.pdf. The post also had no "immediate legal effect," as Supervisor Fielder was "merely repeat[ing] or shar[ing] otherwise available information." *See Lindke*, 601 U.S. at 203. Thus, the post's "content and function" make clear that Supervisor Fielder was "engaging in private speech 'relate[d] to [her] public employment,'" not exercising state authority. *See id.* (citations omitted); *Campbell*, 986 F.3d at 826–28 (8th Cir. 2021).

Further, the "context" of Supervisor Fielder's account does not indicate that it was for official use. *See Lindke*, 601 U.S. at 202. While the account does not contain an explicit disclaimer that it is personal, the account contains no official labels either: the account handle is "@JackieFielder_" rather than, for example, "@SFDist9Supervisor." Compl. ¶ 61 (Dkt. 1); Opp'n City's MTD, at 1 (Dkt. 18) (headline of Supervisor Fielder's account is "**Supervisor, District 9 🏳️‍🌈🇲🇽🪶 Climate advocate, Democratic Socialist, cofounder @sfpublicbank**"). Furthermore, Supervisor Fielder created her X account "years before she joined the Board of Supervisors, and she has used the account to express her views about various topics," including her opinions on "techno fascists."[5] City's MTD, at 11 (Dkt. 11); Opp'n City's MTD, at 1 (Dkt. 18); *see Lindke*, 601 U.S. at 191–92 (noting that the defendant had created his Facebook profile years before he was appointed city manager and updated his Facebook page to reflect his new job); *compare Garnier*, 136 F.4th at 1192 ("In fact, O'Connor-Ratcliff maintained a separate, private Facebook account for engaging with her family and friends in her personal capacity—a digital 'barbecue' where she spoke as a relative, friend, and neighbor."). Thus, the context of Supervisor Fielder's account suggests that it was at best, "mixed use," if not entirely personal. *See Lindke*, 601 U.S. at 202.

---

[5] Plaintiff claims that the post "fixed" to the top of Supervisor Fielder's X page demonstrates that "no one would assume that this is Ms. Fielder's personal account where she describes the meatballs she may have eaten from her favorite restaurants." Opp'n City's MTD, at 1 (Dkt. 18). This X post states:

> "Holy cow, San Francisco techno fascists put out an attack ad on me just because DoorDash will now have to *ask the City for permission* to fly drones at their property in *my district* after my legislation passed *unanimously*! Also looks like Elon Musk chimed in…" *Id.*

20

United States District Court
Northern District of California

Plaintiff thus fails to demonstrate that Supervisor Fielder's conduct of disabling comments on her Sanctuary City post was state action under either prong of *Lindke v. Freed*. Because Supervisor Fielder was acting in a "private capacity," rather than exercising actual authority from the City, she cannot be held liable for exercising her own First Amendment right to maintain "editorial control over speech and speakers" on her X posts. *See Lindke*, 601 U.S. at 197; *Halleck*, 587 U.S. at 816. Accordingly, the Court **GRANTS** the City's Motion to Dismiss Counts 1 and 2. Because the Court finds that Supervisor Fielder did not engage in state action, the City's defense of qualified immunity is moot.

### 3. Joint Cooperation (X Corp)

In general, a "private entity hosting speech on the Internet is not a state actor," regardless of its "ubiquity" or "role as a public-facing platform." *Prager Univ. v. Google LLC*, 951 F.3d 991, 995, 997 (9th Cir. 2020); *see Halleck*, 587 U.S. at 812. However, Plaintiff argues that X was a "joint participant in the deprivation of [her] First Amendment rights." Opp'n X Corp.'s MTD, at 5–6 (Dkt. 26). Under a joint action theory, the court "focuses on whether the state has 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity. . .'". *Gorenc v. Salt River Project Agr. Imp. & Power Dist.*, 869 F.2d 503, 507 (9th Cir. 1989) (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)).

For private entity to be a joint participant in state action, there must first *be* state action. But as discussed above, Supervisor Fielder blocking comments on her Sanctuary City post was not state action; thus, there was no state action for X to jointly participate in. *See Lindke*, 601 U.S. at 198. This absence of state action is enough to dispense with Plaintiff's claim of joint participation. There is no state action predicate for a claim of joint action.

X's Motion to Dismiss Counts 1 and 2 is **GRANTED**.

21

United States District Court
Northern District of California

**D.  *Monell* Liability Under 42 U.S.C. § 1983 for Count 3**

In *Monell*, the Supreme Court held that municipalities may be found liable under Section 1983 for a "policy or custom" that "inflicts" a constitutional violation.  *Monell v. Dep't of Soc. Servs. New York*, 436 U.S. 658, 694–95 (1978).  To state a *Monell* claim, a "plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'"  *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989)).

As discussed above, Plaintiff cannot establish that Supervisor Fielder's act of disabling comments on her Sanctuary City post deprived Plaintiff of any constitutional right.  Because Supervisor Fielder was not posting on X "for official purposes," her social media page was not a "public forum" where "viewpoint discrimination is prohibited."  *See* Compl. ¶ 129 (Dkt. 1); *Lindke*, 601 U.S. at 201.  Again, there is no state action as required for her constitutional claim. Without such an underlying violation, Plaintiff cannot state a *Monell* claim against the City.

The Court **GRANTS** the City's Motion to Dismiss Count 3.

**E.  Dismissal Without Leave to Amend**

Because Plaintiff cannot demonstrate that Supervisor Fielder's conduct was state action under *Lindke v. Freed*, the Court grants dismissal without leave to amend.  Plaintiff cannot meet the threshold requirement of demonstrating that Supervisor Fielder had actual authority to speak on behalf of the City using her X account, as the Charter, the Brown Act, and the Sunshine Ordinance all make clear that individual supervisors do not speak on behalf of the City through their personal social media accounts.  *See Lindke*, 601 U.S. at 201; S.F., CAL., Charter art. II, §§ 2.104, 2.105, 2.117;  Cal. Gov't Code §§ 54950, 54953(a), 54954.3(a)(1); S.F., CAL., Admin. Code §§ 67.21, 67.23; *compare Garnier*, 136 F.4th at 1188–90.  No additional evidence would change this outcome such that Plaintiff could sustain any of her Section 1983 claims.

In her Opposition to the City's Motion to Dismiss, Plaintiff for the first time claims that

Supervisor Fielder herself reported Plaintiff to X for Plaintiff's opposition to sanctuary city policies, which X "then acted on" to suspend her account. Opp'n City's MTD, at 7 (Dkt. 18). These claims contradict the allegations in the Complaint, where Plaintiff states that she wrote to X's customer support to report Supervisor Fielder for blocking people from commenting on her posts. Compl. ¶¶ 52, 53 (Dkt. 1). According to the Complaint, X responded to these messages from Plaintiff by suspending her account. *Id.* ¶ 54. Even if Plaintiff amended to allege that Supervisor Fielder personally reported Plaintiff to X, that theory would not cure Plaintiff's state action problem. Plaintiff would still be unable to demonstrate that the City, either through written law or custom, entrusted Supervisor Fielder with the specific authority of communicating with the public through X and to squelch the voice of those who disagree with her. *See Lindke*, 601 U.S. at 199–201. In short, even if X acted at the behest of Supervisor Fielder, there would still be no state action and thus no basis for a constitutional claim. Consequently, "amendment of the complaint would be futile" such that dismissal with prejudice is warranted. *Albrecht v. Lund*, 845 F.2d 193, 195 (9th Cir. 1988).

## IV.    CONCLUSION

The Court **GRANTS** the City and X Corp.'s Motions to Dismiss on all counts for failure to state a claim. Dismissal is without leave to amend. X Corp's Motion to Transfer is **DENIED** as moot.

**IT IS SO ORDERED**.

Dated: 5/12/2026

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

23